USAO2020R01183/CM/AM

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA | : Hon. Madeline Cox Arleo |
| | : |
| | : Criminal No. 21-203(MCA) |
| v. | : |
| | : |
| | : 15 U.S.C. §§ 78j(b) and 78ff |
| GEORGE HECKLER | : 17 C.F.R. § 240.10b-5 |

**INFORMATION**

The Defendant having waived in open court prosecution by Indictment, the Acting United States Attorney for the District of New Jersey charges:

**COUNT ONE**
**(Securities Fraud)**

**Relevant Individuals and Entities**

1.  At all times relevant to this Information:

    a.  Defendant George Heckler ("HECKLER") was a resident of Charleston, South Carolina. HECKLER managed and/or controlled multiple investment funds, including Cassatt Short Term Trading Fund, LP, CV Special Opportunity Fund, LP, and TA1, LLC.

    b.  Cassatt Short Term Trading Fund, LP ("Cassatt") was an investment fund founded in or around 2010 by HECKLER. Cassatt was managed by its general partner, Cassatt Fund Partners, LLC ("Cassatt LLC"). HECKLER was a member of the general partner and was responsible for all investment activities of Cassatt.

  c. Conestoga Partner Holdings ("Conestoga") was an investment fund founded in or around 1998. HECKLER was responsible for Conestoga's investment activities, including allocating funds to traders and identifying investment opportunities.

  d. CV Special Opportunity Fund, LP ("CVSO") was an investment fund founded in or around August 2010. CVSO was managed by its general partner, CV Fund Partners, LLC. HECKLER was an advisor to the General Partner and was responsible for CVSO's investment decisions.

  e. TA1, LLC ("TA1") was a limited liability company founded in or around 2012 purportedly for the purpose of giving investors access to trading strategies, including an options arbitrage dividend recapture trade also referred to as the "skate trade." HECKLER was responsible for allocating investor capital to traders who were executing trades on behalf of TA1 and managing the risk associated with TA1's trading activities.

  f. CV Fund Administration, LLC ("CVFA") was the fund administrator for Cassatt from in or around 2010 through in or around 2017, for CVSO from in or around 2010 through in or around 2017, and for TA1 from in or around December 2014 through in or around 2017. In this capacity, CVFA provided investors in Cassatt, CVSO, and TA1 with account statements and IRS Form K-1s.

  g. Victim-1 resided in Colorado and was an investor in Conestoga, CVSO, and Cassatt.

h.     Entity-1 was a hedge fund formed in or around 2015, with its principal place of business located in Newport Beach, California.

i.     Entity-2 was a limited liability company and served as the general partner of Entity-1.

j.     Victim-2 resided in California and was the sole managing member of Entity-2.  Since in or around December 2015, Victim-2 was responsible for the day-to-day operations of Entity-1, through his position as the managing member of Entity-2.

## The Scheme to Defraud

2.     Beginning at least as early as in or around 2014 through in or around 2018, in the District of New Jersey and elsewhere, defendant

## GEORGE HECKLER

willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, the mails and facilities of national securities exchanges, in connection with the purchase and sale of securities, used and employed manipulative and deceptive devices and contrivances in violation of Title 17, Code of Federal Regulations, Section 240.10b-5 by (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit

upon persons, to wit, GEORGE HECKLER engaged in a scheme to commit securities fraud regarding interests in Cassatt, CVSO, and TA1.

### Goal of the Scheme

3. The goal of the scheme was for HECKLER to fraudulently induce individuals and entities ("Victim Investors") into investing money in funds he controlled and/or managed, including Cassatt and TA1, by making material misrepresentations and omissions to Victim Investors concerning how their money would be invested and how their past investments had performed.

### Manner and Means of the Scheme to Defraud

4. It was part of the scheme to defraud that:

   a. HECKLER misrepresented to investors that he would invest their funds in particular trading strategies. Instead, HECKLER diverted Victim Investors' funds out of Cassatt and TA1 for purposes inconsistent with the trading strategies, including to pay out millions of dollars to other investors. HECKLER also used Victim Investors' funds to cover investment losses suffered by other funds under his management and/or control.

   b. HECKLER extracted approximately $1 million in fees and distributions from the fraudulently obtained investments for his personal use.

### Victim-1's Investments in CVSO and Cassatt

   c. In or around 2004, Victim-1 began investing in Conestoga. Victim-1 understood from HECKLER that Conestoga employed a "first loss" trading strategy, meaning that the fund would provide capital to traders in exchange for traders contributing 10 percent of their own capital to the fund

("first loss capital"). Any losses suffered by a trader would first be drawn against the trader's first loss capital before impacting the capital invested by the fund's limited partners.

        d.    In or around 2009, Conestoga began suffering millions of dollars in losses from an illiquid investment, and HECKLER formed CVSO to conceal those losses from investors, including Victim-1. In or around 2010, Victim-1's investments in Conestoga were transferred to CVSO.

        e.    In or around 2010, HECKLER formed Cassatt. HECKLER represented to investors, including Victim-1, that Cassatt—like Conestoga—employed a "first loss" trading strategy. As of in or around December 2013, Cassatt no longer had a brokerage account that was necessary to employ the represented trading strategy.

        f.    Despite Cassatt no longer having a brokerage account, in or around 2014, HECKLER represented to Victim-1 that Cassatt was still engaged in a first loss trading strategy and solicited Victim-1's investment in Cassatt. In or around September 2014, Victim-1 invested approximately $9.1 million in Cassatt in reliance on HECKLER's representation that Victim-1's money would be invested consistent with Cassatt's first loss trading strategy. HECKLER used approximately $4.6 million of Victim-1's investment to repay existing investors and the remainder to satisfy other obligations HECKLER owed that were unrelated to Cassatt.

        g.    In or around 2011, Victim-1 established a pension fund for her business ("Pension Fund 1"). Between in or around 2011 and in or around

2015, Victim-1 made yearly contributions to Pension Fund 1; those contributions were invested in Cassatt in reliance on HECKLER's representation that Victim-1's money would be invested consistent with Cassatt's first loss trading strategy. Specifically, on or about September 15, 2015, Victim-1 contributed approximately $51,917 to Pension Fund 1, which was, in turn, invested in Cassatt.

   h. At the time of Victim-1's September 2014 and September 2015 investments, Cassatt did not have a brokerage account, traders, or the infrastructure necessary to execute trades. HECKLER used millions of dollars of Victim-1's investments to repay other Cassatt and CVSO investors and pay down debts of entities under his control. HECKLER never informed Victim-1 that Victim-1's investment would be used to repay other investors or repay debts, and this fact was never disclosed on any of the account statements or Form K-1s that Victim-1 received from Cassatt.

   i. From in or around 2011 through in or around 2018, HECKLER monitored the performance of Cassatt and CVSO, and reviewed and approved statements sent to Cassatt and CVSO investors, including Victim-1. HECKLER knew the statements sent to Cassatt and CVSO investors contained false and misleading information about the status and value of investors' assets. Specifically, the statements misled investors into believing the value of their investments were increasing, when, in fact, they were declining.

**Victim-2's Investment in TA1**

j.  In or around 2014, HECKLER approached Victim-2 about the possibility of creating a hedge fund that would be composed of Class A share classes and Class B share classes.  HECKLER proposed structuring the fund such that Class A investors would deploy capital to first-loss traders, who would serve as the "first loss" protection for investors' capital.  Class B investors would then contribute approximately 10 percent of the remaining capital and would serve as a "second loss" protection.  In late 2015, Victim-2 formed Entity-1, a hedge fund, utilizing the concept proposed by HECKLER.

k.  In or around December 2015, Entity-1 invested approximately $5.6 million in TA1 via a participation agreement ("Participation Agreement").  The Participation Agreement provided that Entity-1's investment would be "utilized solely" for an "options arbitrage dividend recapture trade," otherwise known as the "skate trade."  In fact, none of Entity-1's $5.6 million investment was used for the "skate trade."  Instead, Entity-1's $5.6 million investment was used for other purposes, including repaying others who had previously invested with HECKLER.

l.  On or about July 14, 2016, Entity-1 invested approximately $4.5 million into TA1 pursuant to the Participation Agreement.  HECKLER used nearly all of that money to repay a Cassatt investor, rather than to invest in the "skate trade" as explicitly agreed to in the Participation Agreement.

All in violation of Title 15, United States Code, Sections 78j(b) and 78ff, Title 17, Code of Federal Regulations, Section 240.10b-5, and Title 18, United States Code, Section 2.

## FORFEITURE ALLEGATIONS

1. As the result of committing the offense constituting specified unlawful activity as defined in 18 U.S.C. § 1956(c)(7), as alleged in Count One of this Information, defendant GEORGE HECKLER shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the said securities fraud offense, and all property traceable thereto.

2. If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

    a. Cannot be located upon the exercise of due diligence;

    b. Has been transferred or sold to, or deposited with, a third person;

    c. Has been placed beyond the jurisdiction of the Court;

    d. Has been substantially diminished in value; or

    e. Has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to 21 U.S.C. § 853(p), as incorporated by 28 U.S.C. § 2461(c), to seek forfeiture of any other property of the defendant up to the value of the above forfeitable property.

*[signature]*
RACHAEL A. HONIG
ACTING UNITED STATES ATTORNEY

CASE NUMBER: 21-_____

# United States District Court
# District of New Jersey

**UNITED STATES OF AMERICA**

v.

**GEORGE HECKLER**

# INFORMATION FOR

**15 U.S.C. §§ 78j(b), 78ff**
**17 C.F.R. § 240.10b-5**

RACHAEL A. HONIG
ACTING UNITED STATES ATTORNEY
FOR THE DISTRICT OF NEW JERSEY

CATHERINE R. MURPHY
ANDREW MACURDY
ASSISTANT U.S. ATTORNEYS
NEWARK, NEW JERSEY
(973) 645-2700